1  Josh H. Escovedo, State Bar No. 284506
   Darrin M. Menezes, State Bar No. 202729
2  **WEINTRAUB TOBIN** CHEDIAK COLEMAN GRODIN
   Law Corporation
3  400 Capitol Mall, 11th Floor
   Sacramento, California   95814
4  Telephone:   916.558.6000
   Facsimile:   916.446.1611
5  Email:  jescovedo@weintraub.com; dmenezes@weintraub.com

6  Attorneys for Plaintiff Deals Way Ltd. DBA Market Beyond

7

8                   UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10 DEALS WAY LTD., an Israeli corporation,      )  Case No.
   DBA MARKET BEYOND                            )
11                                              )
                                                )
12                  Plaintiff,                  )  **COMPLAINT AND DEMAND FOR JURY**
                                                )  **TRIAL**
13          v.                                  )
                                                )
14 JUMPSHOT, INC., a Delaware corporation;      )
   and AVAST SOFTWARE, INC., a Delaware         )
15 corporation,                                 )
                                                )
16                  Defendants.                 )
                                                )
17                                              )
                                                )
18                                              )
                                                )
19                                              )
                                                )
20                                              )
                                                )
21 ─────────────────────────────────────────   )

22          Deals Way Ltd. ("Market Beyond") alleges as follows:

23                   NATURE OF THE ACTION

24          1.      Market Beyond entered into an agreement with Jumpshot, Inc. in June 2016,

25 whereby Market Beyond agreed to purchase data concerning consumer activity on the internet.

26 In essence, Jumpshot, Inc. sold data that it acquired from its parent entity, Avast Software, Inc.,

27 to Market Beyond, enabling Market Beyond to provide its clients with actionable insights that

28 optimize e-commerce inefficiencies at the product level.

**weintraub tobin** chediak coleman grodin
law corporation

2.     Market Beyond and Jumpshot, Inc. carried out their respective obligations under the agreement for three and a half years until, on January 30, 2020, Jumpshot, Inc. notified Market Beyond, and its other clients, that it would no longer provide data to its clients, as its data source provider was no longer providing data to Jumpshot, Inc. Contrary to express representations in the agreement, it turned out that Jumpshot, Inc. only had one data source provider. At the time that Jumpshot, Inc. terminated its relationship with Market Beyond and ceased operations, there were two outstanding work orders for data services between Market Beyond and Jumpshot, Inc.

3.      What Jumpshot, Inc. didn't say in its letter to its customers was that its data provider, Avast Software, Inc., had ceased providing raw data to Jumpshot, Inc. because of a data-privacy controversy. Specifically, an investigation revealed that Avast Software, Inc. was harvesting data from its Avast Antivirus software users and selling that data to its subsidiary, Jumpshot, Inc., which then sold that data to customers such as Home Depot and Market Beyond as market intelligence data. Jumpshot never disclosed to Market Beyond how its data was obtained. When this information became public, there was a significant backlash from users, causing a substantial drop in Avast's stock price. As a result, Avast stopped providing data to Jumpshot, Inc., disregarding Jumpshot, Inc.'s obligations to its users, and caused Jumpshot, Inc. to cease operations since, contrary to its written representations, Jumpshot only had one data source provider.

4.     At the time that Jumpshot, Inc. unilaterally terminated its agreement with Market Beyond, in violation of the implied covenant of good faith and fair dealing, Market Beyond had already entered into numerous agreements with third parties that required Market Beyond's possession of the raw data that it contracted to receive from Jumpshot, Inc. Jumpshot, Inc. and Avast Software, Inc. knew, or should have known, that Market Beyond had entered into contractual relationships with third parties to provide services that required its possession of the raw data provided by Jumpshot, Inc. In fact, the agreement between Market Beyond and Jumpshot, Inc. is entirely predicated upon Market Beyond's repackaging and/or use of the data for Market Beyond's clientele. Nonetheless, Jumpshot, Inc. and Avast Software,

weintraub tobin chediak coleman grodin
law corporation

Inc. ceased providing consumer data, rendering Market Beyond unable to meet its obligations under its agreements with its clients. Thus, Jumpshot, Inc.'s and Avast Software, Inc.'s conduct interfered with Market Beyond's contractual relations and its prospective economic advantage.

5.      Accordingly, Market Beyond comes to this Court to seek relief.

## THE PARTIES

6.      Deals Way, Ltd., doing business as Market Beyond, is a duly registered Israeli corporation, with its principal place of business located in Tel Aviv, Israel. Market Beyond is an e-commerce analytics company that provides Fortune 500 brands and online retailers with actionable insights that optimize e-commerce inefficiencies at the product level.

7.      Defendant Jumpshot, Inc. ("Jumpshot") is a duly registered Delaware corporation, with its principal place of business located at 333 Bryant Street, Suite 240, San Francisco, CA 94107. Jumpshot is duly authorized to do business in the State of California.

8.      Defendant Avast Software, Inc. ("Avast") is a duly registered Delaware corporation, with its principal place of business located at 2625 Broadway Street, Redwood City, CA 94063. Avast is duly authorized to do business in the State of California.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

9.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

10.      Venue is proper in the Northern District of California pursuant to the requirements of 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

11.      Venue is also proper in the Northern District of California pursuant to the terms of the agreement between Market Beyond and Jumpshot. Section 11.3 of the agreement states that "[t]he parties consent to the exercise of jurisdiction by the state or federal courts in it the State of California for any claim relating to this Agreement."

12.      This Court has personal jurisdiction over the parties because they have transacted business within the State of California.

13.     Pursuant to Civil L.R. 3-2, this action is properly assigned to either the San Francisco Division or the Oakland Division because the action arises out of San Francisco County.

## FACTUAL ALLEGATIONS

14.     On June 1, 2016, Jumpshot and Market Beyond entered into a Data Services Agreement (the "Agreement"). According to its terms, the Agreement, and the Work Order Terms and Conditions expressly referencing the Agreement, govern each work order expressly referencing the Agreement entered into by Jumpshot and Market Beyond.[1]

15.     Section 1.1 of the Agreement states:

This Agreement sets forth the terms and conditions of the engagement of Jumpshot by Customer to provide Data Services deliverables that are derived from Jumpshot's Raw Data and constitute Custom Reports. "Raw Data" means the anonymized usage data collected and used by Jumpshot for the Custom Report(s). "Custom Report" means the Data Services deliverable described in an applicable Work order that Jumpshot prepares and delivers to Customer. Each Custom Report order will be set forth in a Work Order.

16.     Section 1.2 states:

Jumpshot hereby grants Customer a worldwide, non-transferable (except as set forth below), non-exclusive and limited license to: (i) download each Custom Report developed, prepared or otherwise made available by Jumpshot to Customer, as described in each Work Order, (ii) analyze, store, cache, copy, and review each Work Order in perpetuity for Customer's internal business use only; (iii) use the Custom Report to create products and services that integrate or are derived from one or more Custom Reports, and/or other data or other information provided by other third parties (collectively, the "**Compiled Works**" and each, a "**Compiled Work**") and as permitted by this Agreement; (iii) [sic] transmit, market, and sublicense one or more copies of the Custom Report within each Compiled Work to Customer's Customers (the "Customer Users"). Each sublicense to Customer Users, is a "**Syndication**".17.     Section 2.2 of the Agreement states:

Jumpshot may, at any time, request restrictions and/or prohibitions on the use of the Custom Reports, to the extent that substantially identical restrictions are imposed on Jumpshot by <u>third parties</u>, including, without limitation local, state or federal statutes or regulations; judicial or regulatory interpretations thereof, or contractual obligations placed upon Jumpshot by <u>its data source providers</u>. In such event, Jumpshot shall provide Customer prompt written notice (a "**Restriction Notice**") of such restrictions and prohibitions, and Customer shall promptly comply with such restrictions or prohibitions, but in each case no later than within thirty (30) days following receipt of the Restriction Notice. If Customer reasonably believes that such restrictions or prohibitions are

---

[1] Attached hereto as **Exhibit 1** is a true and correct copy of the June 1, 2016 Agreement between Jumpshot and Market Beyond.

weintraub tobin chediak coleman grodin
law corporation

reasonably likely to materially affect Customer's rights under this Agreement or any Work Order, including with respect to any Custom Report(s), Customer may provide Jumpshot with a notice (a **"Diminution Notice"**); provided that the Diminution Notice is received by Jumpshot within thirty (30) days after receipt of the Restriction Notice. In the event that Customer provides Jumpshot a Diminution Notice, the Parties shall work together in good faith to determine a mutually agreed adjustment to the Revenue Share or other terms of this Agreement or any Work Order during the subsequent thirty (30) day period. If the Parties are not able to negotiate a mutually acceptable amendment to this Agreement or such Work Order within such thirty (30) day period, then Customer may terminate this Agreement and/or any Work Order, or any portion thereof, upon written notice to Jumpshot.

(Underline emphasis added).

17.     Section 3.1 of the Agreement states:

Jumpshot warrants that: (i) the Custom Reports will be available for download by Customer during the Term, in compliance with this Agreement; (ii) Jumpshot owns or otherwise has the right to provide the Raw Data in the Custom Reports to Customer under this Agreement; (iii) Jumpshot has a good faith belief that the Raw Data in the Custom Reports is collected in compliance with laws applicable to the data; (iv) Jumpshot has a good faith belief that such Custom Reports do not include personally identifiable information ("PII"); and (v) it has all licenses, consents and/or authorizations necessary for Jumpshot to license the Custom Reports to Customer under this Agreement. The remedies set out in this Section 3 are Customer's exclusive remedies for breach of these warranties.

18.     Section 5 of the Agreement, titled Term of Agreement, states:

Unless earlier terminated as set forth in Section 4, the term of this Agreement shall begin on the first Start Date set forth in the Work Order first entered into by and between the Parties and shall remain in effect until the last End Date with respect to such Work Order or subsequent Work order(s), if applicable (the **"Term"**)

19.     Section 7.1 of the Agreement states:

Either Party may terminate any or all rights granted under any Work Order and/or may terminate this Agreement or a Custom Reports [sic], if (i) the other breaches any material term of such Work order (including a material term of this Agreement insofar as it applies to such Work Order) or breaches a material term of this Agreement and the breach is not cured within thirty (30) days following receipt of written notice; (ii) the other Party ceases to function as a going concern or to conduct its operations in the normal course of business; or (iii) receivership, bankruptcy, or insolvency proceedings are commenced by or against the other Party, or an assignment for the benefit of creditors of the other Party occurs, or upon the voluntary winding up or liquidation of the other Party's business by the other Party.

20.     Section 7.4 of the Agreement states:

Sections that by their terms are intended to survive shall survive the expiration or termination of this Agreement and/or any Work order, including without limitation, Sections 1.2, 1.3, 1.4, 1.5, 2.3, 5, 6.4, 7, 8, 9, 10, and 11 shall so survive. In addition, the rights (including licenses) and obligations of the Parties pursuant to this Agreement and each Work Order will continue in effect after the termination or expiration of this Agreement and/or any Work Order, as though

the Term continued with respect to each agreement entered into during the Term between Customer and a Customer User with respect to a Compilation Work, for a term not to exceed twelve months from the date of the applicable Customer User agreement (a "**Customer Contract**") and pursuant to which Customer has any continuing obligations, until the latest date of termination or expiration of any such Customer Contract.

21.     Section 8, titled Limitation of Liability, states:

EXCEPT (A) PURSUANT TO SUCH PARTY'S INDEMNIFICATION OBLIGATIONS IN THIS AGREEMENT, OR (B) IN THE CASE OF SUCH PARTY'S FRAUD OR ANY OTHER INTENTIONAL BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, LOST OR CORRUPTED CUSTOM REPORT, LOST PROFITS, LOST BUSINESS OR LOST OPPORTUNITY), OR ANY OTHER SIMILAR DAMAGES UNDER ANY THEORY OF LIABILITY (WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR ANY OTHER THEORY), EVEN IF THE OTHER PARTY HAS BEEN INFORMED OF THIS POSSIBILITY, AND EXCEPT FOR AMOUNTS PAYABLE TO JUMPSHOT OR CUSTOMER'S BREACH OF SECTION 1 OR 2, EACH PARTY'S TOTAL LIABILITY FOR ANY DIRECT LOSS, COST, CLAIM OR DAMAGES OF ANY KIND UNDER THIS AGREEMENT SHALL NOT EXCEED THE AMOUNT OF THE FEES PAID OR PAYABLE BY CUSTOMER TO JUMPSHOT DURING THE 12 MONTHS BEFORE THE EVENT GIVING RISE TO SUCH LOSS, COST, CLAIM OR DAMAGES.

22.     Section 11.3 of the Agreement states: "This Agreement will be governed by the laws of California (excluding its choice of law rules). The Parties consent to the exercise of exclusive jurisdiction by the state or federal courts in the State of California for any claim relating to this Agreement."

23.     On June 2, 2016, Market Beyond and Jumpshot also entered into an agreement titled Work Order Terms and Conditions (the "Terms and Conditions").[2]

24.     Section 1 of The Terms and Conditions states:

These Terms and Conditions govern, and form a part of, each Work Order entered into by mutual written agreement of the parties hereto pursuant to the Data Services Agreement, dated June 1, 2016, by and between Jumpshot, Inc. and Deals Way, Ltd. (as amended from time to time, the "**Agreement**").

25.     Section 2 of the Terms and Conditions states:

The term of the Work Order will start on the Start Date, and will expire on the End Date. The Parties may renew the services provided pursuant to a Work Order by entering into an additional Work Order with respect to time periods following the End Date. At "**End Date**", Customer may no longer sell Syndications to new Customer's Users or new Syndications to existing Customer's Users.

---

[2] Attached hereto as **Exhibit 2** is a true and correct copy of the June 2, 2016 Work Order Terms and Conditions.

weintraub tobin chediak coleman grodin
law corporation

**weintraub tobin** chediak coleman grodin
law corporation

However, Syndications to new Customer's Users on or before the End Date, Jumpshot will provide the Custom Report for such Syndication for up to twelve months from the date the Syndication was first sold to an applicable Customer's User(s).

26.     Simultaneously with the execution of the Terms and Conditions, Jumpshot also executed its first Work Order for Jumpshot Data Services, with a commencement date of June 1, 2016, and an end date of August 31, 2016. Both parties performed their obligations under this work order, and accordingly, this work order is not at issue in this dispute.

27.     On May 1, 2019, Market Beyond and Jumpshot entered into two separate work orders for data services. Both work orders had a start date of May 1, 2019, but one work order had an end date of April 30, 2020, and the other had an end date of April 30, 2021. The production fees for the two work orders were $290,000 and $375,000, respectively.[3]

28.     The parties performed their respective obligations under these work orders until January 30, 2020, when Jumpshot sent correspondence to Market Beyond stating:

Dear Customer,

**Restriction of provision of data and related services under the data licensing agreement between you and Jumpshot, Inc. ("Jumpshot") and related work orders (the "Agreement")**

We refer to the Agreement. Capitalized terms used in this notice, unless otherwise expressly defined, shall have the meanings given to them in the Agreement.

As a result of a data provider of Jumpshot, with immediate effect, no longer providing data to and imposing restriction and prohibitions on the use of data by Jumpshot, Jumpshot hereby gives notice to you pursuant to the Agreement that with effect from the data of this notice, it is no longer able to provide to you the data feed or deliverables under the Agreement and you can no longer use such data or deliverables. As a result of this, Jumpshot therefore confirms that it will no longer have a relationship with you pursuant to which it provides data.

To the extent you have pre-paid any fees to Jumpshot for undelivered deliverables and / or services in connection with the Agreement, we will arrange for you to receive a refund of a pro-rata portion of those fees corresponding to the deliverables and / or services that you will no longer receive.

We appreciate your cooperation in managing this unexpected turn of events that is beyond our reasonable control.

Yours faithfully,

---

[3] Attached hereto as **Exhibits 3 and 4** are the May 1, 2019 work orders for data services between Jumpshot and Market Beyond.

[signature omitted]
Deren Baker
Jumpshot, Inc.[4]

29.     Market Beyond is informed and believes that Jumpshot's letter was sent to Jumpshot's customers as a result of a data privacy controversy. Specifically, on January 27, 2020, Motherboard released an article titled Leaked Documents Expose the Secretive Market for Your Web Browsing Data, reporting that, "[a]n Avast antivirus subsidiary sells 'Every search. Every click. Every buy. On every site.' Its clients have included Home Depot, Google, Microsoft, Pepsi, and McKinsey." The article stated that a joint investigation by Motherboard and PCMag revealed that Avast was "selling highly sensitive web browsing data to many of the world's biggest companies." In short, Avast was collecting data from its 435 million active users who opted in, and then providing that information to Jumpshot, who sold the data to its customers, including Market Beyond. Motherboard's source stated that Avast was initially collecting the browsing data of its customers who installed the company's browser plugin, which is designed to warn users of suspicious websites. After this was exposed, Avast stopped collecting data in that manner, and instead began harvesting data through the anti-virus software itself. Three days later, on January 30, 2020, Avast announced that it would stop collecting and selling its users web browsing data, and that it would shut down Jumpshot.

30.     Despite Jumpshot's express representation in Section 2.2 of the Data Services Agreement and its website, where Market Beyond represented that it leverages "the world's largest *sources* of de-identified and aggregated data," Market Beyond is informed and believes that, at all times relevant to this complaint, Jumpshot only had one data source provider.[5] If Jumpshot had another data source provider, as it represented to Market Beyond, it would have still been able to provide data to Market Beyond after Avast ceased providing data to Jumpshot. Moreover, Market Beyond is informed and believes that after Jumpshot was informed that Avast would no longer provide it with data, Jumpshot failed and refused to make

---

[4] Attached hereto as **Exhibit 5** is a true and correct copy of Jumpshot's January 30, 2020 notice.
[5] web.archive.org/web/20150602080449/https://support.jumpshot.com/support/solutions/articles/100030656-what-is-jumpshot-  (Emphasis added.)

weintraub tobin chediak coleman grodin
law corporation

reasonable and diligent attempts to procure data from an alternate data source provider. Instead, Jumpshot improperly terminated its data services agreements with all of its clients, including Market Beyond.

31.     The actions of Avast and Jumpshot in terminating the provision of data from Avast to Jumpshot, and from Jumpshot to Market Beyond, has caused a massive disruption in Market Beyond's business, interfering in its contractual relationships and prospective economic advantage with third parties. At the time that Defendants ceased the provision of data to Market Beyond, Market Beyond had already entered into numerous contracts with third parties to provide services that require Market Beyond's receipt of data from Jumpshot, and was negotiating and intending to enter into additional such contracts. Because of Defendants' failure to provide the data, however, Market Beyond will be unable to perform its obligations under its contracts to provide services for third parties, and it will be unable to enter into additional such contracts, resulting in significant lost profits, and potential exposure to liability for breach of contract. Accordingly, on February 18, 2020, Market Beyond caused a demand letter to be sent to Jumpshot and Avast.[6]

32.     On February 24, 2020, Jumpshot's CEO, Deren Baker, responded in writing, declining Market Beyond's demand, and stating:

Dear Mr. Escovedo:

I write in response to your letter dated February 18, 2020 regarding Jumpshot's recent cessation of operations as a result of the decision by its primary data supplier, Avast Software s.r.o. ("Avast"), to cease its provision of data to Jumpshot.

On January 30, 2020, Avast notified Jumpshot that it was imposing a prohibition on Jumpshot's use of the data in accordance with the terms of the license agreement entered into between the parties such that: (1) Jumpshot was prohibited from using the data it had previously received from Avast, and (2) Jumpshot would not receive any further data from Avast. Upon receiving this notification, Jumpshot notified its customers that it would be imposing an equivalent prohibition on the data provided to them, and that Jumpshot would be ceasing operations with immediate effect due to matters outside of its control.

As explained during the negotiations with your client, Deals Way Ltd., doing business as Market Beyond ("Market Beyond"), Jumpshot did not own the

---

[6] Attached hereto as **Exhibit 6** is a true and correct copy of Market Beyond's February 18, 2020 demand letter.

data underlying its products and services, but directly licensed it from Avast. In acknowledgement of the fact that Jumpshot relied on an external data supplier, and in contemplation of a scenario such as this, Market Beyond agreed to Section 2.2 of the Data Services Agreement entered into with Jumpshot dated June 1, 2016 ("DSA"), which reads:

> "2.2. Jumpshot may, at any time, request restrictions and/or prohibitions on the use of the Custom Reports, to the extent that substantially identical restrictions are imposed on Jumpshot by third parties, including, without limitation local, state or federal statutes or DocuSign Envelope ID: 3440367C-93CF-4699-963C-7C41DE0952B52 regulations; judicial or regulatory interpretations thereof; or contractual obligations placed upon Jumpshot by its **data source providers**. In such event, Jumpshot shall provide Customer prompt written notice (a "Restriction Notice") of such restrictions or prohibitions, and Customer shall promptly comply with such restrictions or prohibitions, but in each case no later than within thirty (30) days following receipt of the Restriction Notice. If Customer reasonably believes that such restrictions or prohibitions are reasonably likely to materially affect Customer's rights under this Agreement or any Work Order, including with respect to any Custom Report(s), Customer may provide Jumpshot with a notice (a "Diminution Notice"); provided that the Diminution Notice is received by Jumpshot within thirty (30) days after receipt of the Restriction Notice. In the event that Customer provides Jumpshot a Diminution Notice, the Parties shall work together in good faith to determine a mutually agreed adjustment to the Revenue Share or other terms of this Agreement or any Work Order during the subsequent thirty (30) day period. If the Parties are not able to negotiate a mutually acceptable amendment to this Agreement or such Work Order within such thirty (30) day period, then Customer may terminate this Agreement and/or any Work Order, or any portion thereof, upon written notice to Jumpshot."

Section 2.2 of the DSA clearly contemplates a scenario in which a prohibition on the use of data could be imposed on Market Beyond by Jumpshot where similar restrictions are placed upon Jumpshot by its **data source provider**. Further, it provides for a redress mechanism in such a situation. With our offer to repay all pre-paid fees under the DSA, we have agreed to adjust the fees for the affected deliverables after January 29, 2020 to nil. We therefore completely refute your accusation that Jumpshot has breached the DSA, willfully or otherwise. Jumpshot has merely exercised a right available to it under the DSA.

Finally, your assertion that Avast is an alter-ego of Jumpshot is completely untrue and without basis. Jumpshot was only part-owned by Avast at the time Avast made the decision to cease the provision of data to Jumpshot, with a third party unrelated to the Avast group also holding a significant stake. The Board of Jumpshot comprised of representatives from each of these investors, and I also held a position on the Board as an independent appointee. Jumpshot was run as a standalone business to Avast, with its own independent decision-making body. Jumpshot's intention was to continue supplying its products and services to new and existing customers, with a view to building long-term and mutually beneficial relationships. The decision was made unilaterally by Avast to terminate its data sharing relationship with Jumpshot, which has resulted in the circumstances in which Jumpshot finds itself today.

1    Jumpshot neither had, nor has, access to the same data without Avast's
     cooperation.

2

3        In light of the above, we are unwilling to settle this matter in accordance
     with your proposed terms. Jumpshot is willing to refund any pre-paid amounts
     for services not received; however, we must insist on full payment for all services
4    which have been received, which, in the case of Market Beyond, amounts to
     $95,306.

5        Please   do   not   hesitate   to   contact   me   by   email   at
     deren.baker@jumpshot.com if you wish to discuss this matter in further detail.

6

7    Sincerely,
     [DocuSign Signature Omitted]
     Deren Baker

8    Chief Executive Officer[7]

9    (Emphasis added.) Mr. Baker conveniently changed data source providers from plural to

10   singular when he paraphrased Section 2.2 of the Data Services Agreement.

11   33.    As of the date of this filing, Avast has not responded to Market Beyond's

12   February 18, 2020 letter.

13
         FIRST CLAIM FOR RELIEF - INTENTIONAL MISREPRESENTATION
14                          AGAINST JUMPSHOT

15   34.    Market Beyond realleges and incorporates each of foregoing paragraphs of this

16   Complaint by reference as if fully set forth herein.

17   35.    In the Data Services Agreement, Jumpshot represented to Market Beyond that it

18   had multiple data source providers from whom it received raw data to generate the Custom

19   Reports that Jumpshot sold to Market Beyond. Jumpshot made similar representations on its

20   website and its social media.

21   36.    Jumpshot's representations were false. Market Beyond is informed and believes

22   that, at all times relevant to this complaint, Jumpshot only had one data source provider:

23   Avast.

24   37.    Jumpshot knew that the representations were false when they were made, or

25   made the representations recklessly and without regard for the truth.

26   38.    Jumpshot intended that Market Beyond rely on the foregoing representations.

27

28
     ───────────────
     [7] Attached hereto as **Exhibit 7** is a true and correct copy of Mr. Baker's February 24, 2020  correspondence.

39.   Market Beyond reasonably relied on Jumpshot's representations, and as a result, entered into the Data Services Agreement.

40.   As a result of Jumpshot's conduct, Market Beyond was harmed in an amount to be proven at trial.

41.   Market Beyond's reliance on Jumpshot's representations was a substantial factor in causing its harm.

42.   Jumpshot's conduct was oppressive, fraudulent, and malicious, entitling Market Beyond to exemplary damages.

## SECOND CLAIM FOR RELIEF - NEGLIGENT MISREPRESENTATION AGAINST JUMPSHOT

43.   Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

44.   In the Data Services Agreement, Jumpshot represented to Market Beyond that it had multiple data source providers from whom it received raw data to generate the Custom Reports that Jumpshot sold to Market Beyond. Jumpshot made similar representations on its website and its social media.

45.   Jumpshot's representations were false. Market Beyond is informed and believes that, at all times relevant to this complaint, Jumpshot only had one data source provider: Avast.

46.   Jumpshot had no reasonable grounds for believing the representations were true when they were made.

47.   Jumpshot intended that Market Beyond rely on the foregoing representations.

48.   Market Beyond reasonably relied on Jumpshot's representations, and as a result, entered into the Data Services Agreement.

49.   As a result of Jumpshot's conduct, Market Beyond was harmed in an amount to be proven at trial.

50.   Market Beyond's reliance on Jumpshot's representations was a substantial factor in causing its harm.

weintraub tobin chediak coleman grodin
law corporation

weintraub tobin chediak coleman grodin
law corporation

## THIRD CLAIM FOR RELIEF - UNFAIR COMPETITION - FALSE DESCRIPTION
### (15 U.S.C. § 1125)
### AGAINST JUMPSHOT

51.   Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

52.   Jumpshot utilized a false and misleading representation of fact in connection with its data services and commercial activities. Specifically, Jumpshot falsely and misleadingly represented that it had multiple data source providers to supply the raw data it required to generate the Custom Reports that it contracted to provide to Market Beyond. On its website, Jumpshot falsely represented that it leverages "the world's largest *sources* of de-identified and aggregated data, from hundreds of millions of consumers around the globe." (Emphasis added.)

53.   Jumpshot's representations were made in commercial advertising or promotion, including its website, and misrepresent the nature, characteristics, and qualities of Jumpshot's services and commercial activities. As Market Beyond learned the hard way, Jumpshot's sole data source provider was Avast.

## FOURTH CLAIM FOR RELIEF - BREACH OF CONTRACT
### AGAINST JUMPSHOT

54.   Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

55.   Market Beyond and Jumpshot entered into the Agreement on June 1, 2016. In that Agreement, Jumpshot promised to provide Market Beyond with Data Services Deliverables derived from Jumpshot's raw data in exchange for monetary compensation.

56.   Market Beyond did all, or substantially all, of the significant things that the Agreement required it to do.

57.   All conditions required for Jumpshot's performance occurred.

58.   Jumpshot breached the contract by failing and refusing to provide the agreed-upon deliverables to Market Beyond, and instead terminating the Agreement with Market Beyond to protect its parent entity, Avast, from further public backlash arising out of the

1  aforementioned data-privacy controversy. Jumpshot further breached the contract by failing
2  and refusing to procure multiple data source providers to supply the raw data it required to
3  generate the Custom Reports that it contracted to provide to Market Beyond.

4       59.     Jumpshot's breaches proximately caused Market Beyond damages by causing
5  Market Beyond to terminate or breach contracts it had with third parties to provide services for
6  which Jumpshot's data was required. Jumpshot's breaches also proximately caused Market
7  Beyond damages by prohibiting Market Beyond from entering into additional agreements with
8  third parties to provide services for which Jumpshot's data was required.

9       **FIFTH CLAIM FOR RELIEF - BREACH OF THE IMPLIED COVENANT
   OF GOOD FAITH AND FAIR DEALING
10  AGAINST JUMPSHOT**

11       60.     Market Beyond realleges and incorporates each of foregoing paragraphs of this
12  Complaint by reference as if fully set forth herein.

13       61.     Market Beyond and Jumpshot entered into the Agreement on June 1, 2016. In
14  that Agreement, Jumpshot promised to provide Market Beyond with Data Services Deliverables
15  derived from Jumpshot's raw data in exchange for monetary compensation.

16       62.     Implied in the Agreement was and is a covenant of good faith and fair dealing
17  wherein Jumpshot impliedly covenanted that it would, in good faith, and in the exercise of fair
18  dealing, deal with Market Beyond fairly and honestly. The implied covenant requires that
19  Jumpshot diligently perform all acts necessary to effectuate the Agreement between the parties
20  and do nothing to impair, interfere with, impede with, or otherwise prevent Market Beyond
21  from receiving the benefit of the bargain under the Agreement.

22       63.     Market Beyond has performed all conditions, covenants, and promises imposed
23  upon it under the Agreement, with the exception of those conditions, covenants, and promises
24  that Market Beyond was prevented or excused from performing.

25       64.     Jumpshot breached the implied covenant of good faith and fair dealing by: (1)
26  failing to work diligently to ensure that it had an alternative source for data, so that if its
27  primary data source, Avast, ceased providing data, Jumpshot would still be able to honor its
28  contractual obligations to its customers; (2) failing to make reasonable, good-faith efforts to

weintraub tobin chediak coleman grodin
law corporation

procure an alternative data source after Avast ceased providing data; (3) permitting Avast to cease providing data, without contestation, after an investigation revealed that Avast had been harvesting the data from users of its antivirus software, resulting in significant consumer backlash; and (4) by failing to prudently negotiate its agreement with Avast to ensure that Avast did not have the unilateral authority to stop providing data to Jumpshot without repercussions.

65.     As a proximate result of Jumpshot's breach of the covenant of good faith and fair dealing, Market Beyond has suffered damages in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF - UNFAIR COMPETITION**
**(CAL. BUS. & PROF. CODE, § 17200 ET SEQ.)**
**AGAINST ALL DEFENDANTS**

66.     Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

67.     California's Unfair Competition Law (the "UCL")—Cal. Bus. & Prof. Code, § 17200 et seq.—prohibits any unlawful, unfair, or fraudulent business act or practice.

68.     Jumpshot and Avast violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to the following acts or practices: (1) failing to provide raw data as promised under the Agreement; (2) failing to make reasonable and good faith efforts to find another source of data that would enable Jumpshot to honor its contractual obligations; and (3) colluding to underhandedly harvest data from Avast's software users for sale through Jumpshot, and then, when Defendants' despicable conduct was discovered, terminating all contracts with Jumpshot's customers, without regard for the customers' contractual relationships with third parties and right to exploit said agreements for further financial gain.

69.     Jumpshot and Avast have engaged in similar unlawful, unfair, and fraudulent business practices as to agreements with other customers.

70.     As a result of Defendants' unlawful, unfair, and fraudulent business practices, Market Beyond suffered pecuniary loss.

71.     Market Beyond is entitled to, and hereby seeks, restitution from Defendants in an amount to be proven at trial.

72.   Market Beyond is informed and believes, and based thereon alleges, that Defendants will continue to subject others to similar unfair practices unless enjoined.

### SEVENTH CLAIM FOR RELIEF - INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### AGAINST JUMPSHOT

73.   Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

74.   There was a contract between Market Beyond and Jumpshot, whereby Jumpshot was required to provide raw data concerning consumer online activity to Market Beyond from multiple data source providers. Reliant upon that contract, Market Beyond entered into numerous other contracts with third parties to provide services requiring Market Beyond's possession of the data it contracted to buy from Jumpshot.

75.   Jumpshot's conduct prevented performance and/or made performance more expensive or difficult.

76.   Jumpshot intended to disrupt Market Beyond's ability to perform its contracts with third parties, or knew that disruption of performance was certain, or substantially certain to occur.

77.   As a result of Jumpshot's conduct, Market Beyond was harmed.

78.   Jumpshot's conduct was a substantial factor in causing Market Beyond's harm.

79.   Jumpshot's conduct was oppressive, fraudulent, and malicious, entitling Market Beyond to exemplary damages.

### EIGHTH CLAIM FOR RELIEF - INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### AGAINST JUMPSHOT

80.   Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

81.   Market Beyond and various third parties were in an economic relationship that probably would have resulted in an economic benefit to Market Beyond (the "Prospective Clients").

weintraub tobin chediak coleman grodin
law corporation

82.  Jumpshot wrongfully terminated the Agreement with Market Beyond, in violation of its contractual obligations and the implied covenant of good faith and fair dealing, opting instead to conspire with its parent entity, Avast, to shut down its operations in order to quell public backlash that resulted from an investigation revealing that Jumpshot and Avast had been engaged in a conspiracy to underhandedly harvest Avast's software users' data and sell it, through Jumpshot, to customers like Market Beyond. As a result, Market Beyond was forced to discontinue its relationships with the Prospective Clients because it no longer receives the data required to provide services to the Prospective Clients.

83.  By engaging in this conduct, Jumpshot intended to disrupt the relationships that Market Beyond had with the Prospective Clients, or knew that disruption of the relationships was certain, or substantially certain, to occur.

84.  As a result of Jumpshot's conduct, Market Beyond was harmed.

85.  Jumpshot's conduct was a substantial factor in causing Market Beyond's harm.

86.  Jumpshot's conduct was oppressive, fraudulent, and malicious, entitling Market Beyond to exemplary damages.

### NINTH CLAIM FOR RELIEF - NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### AGAINST JUMPSHOT

87.  Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

88.  Market Beyond and the Prospective Clients were in an economic relationship that probably would have resulted in an economic benefit to Market Beyond.

89.  Jumpshot knew, or should have known, of these relationships.

90.  Jumpshot knew, or should have known, that these relationships would be disrupted if Jumpshot failed to act with reasonable care.

91.  Nonetheless, Jumpshot failed to act with reasonable care.

92.  Jumpshot wrongfully terminated the Agreement with Market Beyond, in violation of its contractual obligations and the implied covenant of good faith and fair dealing, opting instead to conspire with its parent entity, Avast, to shut down its operations in order to quell

1  public backlash that resulted from an investigation revealing that Jumpshot and Avast had

2  been engaged in a conspiracy to underhandedly harvest Avast's software users' data and sell

3  it, through Jumpshot, to customers like Market Beyond. As a result, Market Beyond was forced

4  to discontinue its relationships with the Prospective Clients because it no longer receives the

5  data required to provide services to the Prospective Clients.

6       93.    As a result of Jumpshot's conduct, Market Beyond's relationships with the

7  Prospective Clients were disrupted, causing Market Beyond harm.

8       94.    Jumpshot's conduct was a substantial factor in causing Market Beyond's harm.

9  **TENTH CLAIM FOR RELIEF - INTENTIONAL INTERFERENCE WITH
   CONTRACTUAL RELATIONS**
10  **AGAINST AVAST**

11       95.    Market Beyond realleges and incorporates each of foregoing paragraphs of this

12  Complaint by reference as if fully set forth herein.

13       96.    There was a contract between Market Beyond and Jumpshot, whereby Jumpshot

14  was required to provide raw data concerning consumer online activity to Market Beyond.

15       97.    Reliant upon that contract, Market Beyond entered into numerous other

16  contracts with third parties to provide services requiring Market Beyond's possession of the data

17  it contracted to buy from Jumpshot.

18       98.    Avast's conduct prevented Market Beyond's performance and/or made

19  performance more expensive or difficult under the Agreement and Market Beyond's contracts

20  with its customers. Specifically, Avast ceased providing data to its subsidiary, Jumpshot, after

21  an investigation revealed that Avast was underhandedly harvesting data from users of its

22  software and selling that data to Jumpshot, who then sold the data to its customers, such as

23  Market Beyond, who used the information to provide services to their own third-party

24  customers. Accordingly, when Avast sought to suppress the public backlash from its data-

25  privacy controversy by immediately terminating its provision of data to Jumpshot, causing

26  Jumpshot to cease operations, Avast prevented Jumpshot from performing its obligation to

27  provide data to Market Beyond, and as a result, prevented Market Beyond from performing its

28  contractual obligations owed to third parties.

weintraub tobin chediak coleman grodin
law corporation

99. Avast intended to disrupt these agreements, or knew that disruption of performance was certain, or substantially certain, to occur. After all, Avast knew, or should have known, that Jumpshot was reselling this data to customers such as Market Beyond, who were using the data to provide services to third parties, or were otherwise reliant upon the data.

100. As a result of Avast's conduct, Market Beyond was harmed.

101. Avast's conduct was a substantial factor in causing Market Beyond's harm.

102. Avast's conduct was oppressive, fraudulent, and malicious, entitling Market Beyond to exemplary damages.

### ELEVENTH CLAIM FOR RELIEF - INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST AVAST

103. Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

104. Market Beyond was in economic relationships with Jumpshot and the Prospective Clients that probably would have resulted in an economic benefit to Market Beyond.

105. Avast ceased providing data to Jumpshot in order to quell its own data-privacy controversy, causing Jumpshot to wrongfully terminate the Agreement with Market Beyond, in violation of its contractual obligations and the implied covenant of good faith and fair dealing. Consequently, Market Beyond was forced to discontinue its relationships with the Prospective Clients because it would no longer receive the data from Jumpshot required to provide services to the Prospective Clients.

106. By engaging in this conduct, Avast intended to disrupt the relationship that Market Beyond had with Jumpshot, and the relationships that Market Beyond had with the Prospective Clients, or knew that disruption of the relationships was certain, or substantially certain, to occur.

107. As a result of Avast's conduct, Market Beyond was harmed.

108. Avast's conduct was a substantial factor in causing Market Beyond's harm.

109. Avast's conduct was oppressive, fraudulent, and malicious, entitling Market Beyond to exemplary damages.

weintraub tobin chediak coleman grodin
law corporation

## TWELFTH CLAIM FOR RELIEF - NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## AGAINST AVAST

110. Market Beyond realleges and incorporates each of foregoing paragraphs of this Complaint by reference as if fully set forth herein.

111. Market Beyond was in economic relationships with Jumpshot and the Prospective Clients that probably would have resulted in an economic benefit to Market Beyond.

112. Avast knew, or should have known, of these relationships.

113. Avast knew, or should have known, that these relationships would be disrupted if Avast failed to act with reasonable care.

114. Nonetheless, Avast failed to act with reasonable care.

115. Avast ceased providing data to Jumpshot in order to quell its own data-privacy controversy, causing Jumpshot to wrongfully terminate the Agreement with Market Beyond, in violation of its contractual obligations and the implied covenant of good faith and fair dealing. Consequently, Market Beyond was forced to discontinue its relationships with the Prospective Clients because it would no longer receive the data required to provide services to the Prospective Clients.

116. As a result of Avast's conduct, Market Beyond's relationships with Jumpshot and the Prospective Clients were disrupted, causing Market Beyond harm.

117. Avast's conduct was a substantial factor in causing Market Beyond's harm.

## PRAYER FOR RELIEF

WHEREFORE, Market Beyond prays for judgment against Defendants and for the following relief:

1. damages according to proof at trial;

2. exemplary damages pursuant to Civil Code § 3294;

3. cost of suit;

4. reasonable attorneys' fees;

5. prejudgment interest at the maximum legal rate;

6. post-judgment interest at the maximum legal rate;

1      7.      restitution;

2      8.      such other and further relief as the Court deems just.

3    Dated:  April 30, 2020              Respectfully submitted,

4                                        **WEINTRAUB TOBIN** CHEDIAK COLEMAN GRODIN
                                         Law Corporation

5

6                                        By:   /s/ Josh H. Escovedo

7                                              Josh H. Escovedo
                                              California State Bar No. 284506

8                                              Attorneys for Plaintiff Deals Way Ltd.

9                                              DBA Market Beyond

10                        **DEMAND FOR JURY TRIAL**

11      Market Beyond hereby demands a jury trial of all issues in this Complaint which are

12   triable to a jury.

13   Dated:  April 30, 2020              Respectfully submitted,

14                                       **WEINTRAUB TOBIN** CHEDIAK COLEMAN GRODIN
                                         Law Corporation

15

16                                       By:   /s/ Josh H. Escovedo

17                                             Josh H. Escovedo
                                             California State Bar No. 284506

18                                             Attorneys for Plaintiff Deals Way Ltd.

19                                             DBA Market Beyond

20

21

22

23

24

25

26

27

28

**weintraub tobin** chediak coleman grodin
law corporation

# EXHIBIT 1

**Data Services Agreement**

This Data Services Agreement is entered into on June 1st 2016 by and between Jumpshot, Inc. ("**Jumpshot**"), a Delaware corporation, and Deals Way Ltd. an Israeli corporation ("**Customer**" and, together with Jumpshot, the "**Parties**" and each, a "**Party**").  This Data Services Agreement (this "**Agreement**") and the Work Order Terms and Conditions expressly referencing this Agreement govern each Work Order expressly referencing this Agreement and entered into by and between Jumpshot and Customer (each, a "**Work Order**").  By signing a Work Order, each Party agrees as follows:

1. **Custom Report License**.
   1.1. This Agreement sets forth the terms and conditions of the engagement of Jumpshot by Customer to provide Data Services deliverables that are derived from Jumpshot's Raw Data and constitute Custom Reports.  "Raw Data" means the anonymized usage data collected and used by Jumpshot for the Custom Report(s).  "Custom Report" means the Data Services deliverable described in an applicable Work Order that Jumpshot prepares and delivers to Customer.  Each Custom Report order will be set forth in a Work Order.
   1.2. Jumpshot hereby grants Customer a worldwide, , non-transferable (except as set forth below), non-exclusive and limited license to: (i) download each Custom Report developed, prepared or otherwise made available by Jumpshot to Customer, as described in each Work Order; (ii) analyze, store, cache, , copy, and  review each Work Order in perpetuity for Customer's internal business use only; (iii) use the Custom Report to  create products and services that integrate or are derived from one or more Custom Reports, and/or other data or other information provided by other third parties (collectively, the "**Compiled Works**" and each, a "**Compiled Work**") and as permitted by this Agreement; (iii) transmit, market and sublicense one or more copies of the Custom Report within each Compiled Work to Customer's customers (the "Customer Users").  Each sublicense to Customer Users, is a "**Syndication**".
   1.3. Each Custom Report shall be hosted on, and made available via, servers that are controlled by Jumpshot (collectively, the "**Servers**").  Jumpshot will provide Customer one **login username and one login password** to access the Servers and the Custom Reports, and Customer shall be entitled to download the Custom Reports from the Servers.  Customer must retrieve each Custom Report within the delivery interval specified on each Work Order plus two weeks.
   1.4. Customer may make multiple copies of the Custom Reports.  Customer shall not remove Jumpshot's proprietary mark from any copy of a Custom Report, including Custom Reports resold as a Syndication.
   1.5. Subject to <u>Section 1.2</u>, as between Jumpshot and Customer, (i) Jumpshot owns the intellectual property in the Raw Data used in each Custom Report and owns the intellectual property of the Custom Reports and (ii) Customer owns, subject to 1.5(i), each Compilation.

2. **Conditions of Use**. Customer's right to use each Custom Report is conditional upon the following.
   2.1. Customer must promptly notify Jumpshot of any unauthorized use of any Custom Report known to Customer.
   2.2. Jumpshot may, at any time, request restrictions and/or prohibitions on the use of the Custom Reports, to the extent that substantially identical restrictions are imposed on Jumpshot by third parties, including, without limitation local, state or federal statutes or regulations; judicial or regulatory interpretations thereof; or contractual obligations placed upon Jumpshot by its data source providers. In such event, Jumpshot shall provide Customer prompt written notice (a "**Restriction Notice**") of such restrictions or prohibitions, and Customer shall promptly comply with such restrictions or prohibitions, but in each case no later than within thirty (30) days following receipt of the Restriction Notice.  If Customer reasonably believes that such restrictions or prohibitions are reasonably likely to materially affect Customer's rights under this Agreement or any Work Order, including with respect to any Custom Report(s), Customer may provide

4

Jumpshot with a notice (a "**Diminution Notice**"); provided that the Diminution Notice is received by Jumpshot within thirty (30) days after receipt of the Restriction Notice. In the event that Customer provides Jumpshot a Diminution Notice, the Parties shall work together in good faith to determine a mutually agreed adjustment to the Revenue Share or other terms of this Agreement or any Work Order during the subsequent thirty (30) day period. If the Parties are not able to negotiate a mutually acceptable amendment to this Agreement or such Work Order within such thirty (30) day period, then Customer may terminate this Agreement and/or any Work Order, or any portion thereof, upon written notice to Jumpshot.

2.3. Except as otherwise set forth in this Agreement, Customer may not:

2.3.1. transfer to any other person or non-affiliated entity, other than a Customer User or Customer's personnel who are authorized to access the Custom Reports, any of its rights to use any Custom Report;

2.3.2. sell, rent or lease any Custom Report;

2.3.3. use any Custom Report in a way that violates any criminal or civil law; or

2.3.4. use the Custom Report in any manner in an attempt to identify personally identifiable information.

**3. Warranties.**

3.1. Jumpshot warrants that: (i) the Custom Reports will be available for download by Customer during the Term, in compliance with this Agreement; (ii) Jumpshot owns or otherwise has the right to provide the Raw Data in the Custom Reports to Customer under this Agreement; (iii) Jumpshot has a good faith belief that the Raw Data in the Custom Reports is collected in compliance with laws applicable to the data; (iv) Jumpshot has a good faith belief that such Custom Reports do not include personally identifiable information ("PII"); and (v) it has all licenses, consents and/or authorizations necessary for Jumpshot to license the Custom Reports to Customer under this Agreement. The remedies set out in this Section 3 are Customer's exclusive remedies for breach of these warranties.

3.2. If any Custom Report is not available for download in accordance with a Work Order and this Agreement for two (2) consecutive days, in the case of a daily or weekly download period, or seven (7) consecutive days, in the case of a monthly download period, or if such Custom Report is otherwise not in material conformity with the requirements of any Work Order or this Agreement, Jumpshot must immediately, at its option, either: (i) correct the defect and/or make a non-defective Custom Report available for download, as applicable; or (ii) provide a workaround solution, reasonably acceptable to Customer, that will otherwise make a copy of a non-defective Custom Report available to Customer. If neither of these options is commercially feasible, upon request, Jumpshot shall refund to Customer a pro rata portion of amounts paid to Jumpshot under the relevant Work Order for each day that such Custom Report is unavailable or materially defective.

3.3. If the possession or use of any Custom Report by Customer or any Customer User is found to infringe any third party right of privacy or confidentiality or breaches a law or license applicable to the Custom Report, or Jumpshot believes that infringement is likely, Jumpshot must, at its option, either: (i) obtain at its sole expense a license from such third party for the benefit of Customer and such Customer User; (ii) modify such Custom Report in a manner reasonably acceptable to Customer so that it no longer infringes; (iii) substitute non-infringing data or substitute data that complies with applicable laws or licenses; or (iv) if none of these options is commercially feasible, Customer may terminate the relevant Work Order under this Agreement, in which case Jumpshot shall refund to Customer all amounts paid to Jumpshot under the relevant Work Order for the infringing Custom Reports.

3.4. Upon written notice from Customer or upon Jumpshot's independent discovery that there is PII in the Custom Reports, Jumpshot will require the Customer to immediately delete such Custom

5

Reports with PII and Jumpshot will make available for download a new version of the Custom Report without PII.

3.5. However, Jumpshot has no warranty obligations for:

    a. the extent that Custom Report has been misused or modified by Customer or any third party, unless the modification has been approved in writing by Jumpshot;

    b. problems due to the Customer's PC or mobile environment; or

    c. other matters beyond Jumpshot's reasonable control.

3.6. Customer warrants that (i) it will comply with all laws applicable to its obligations and performance under this Agreement, and (ii) it will make no representations or warranties concerning Jumpshot its Customer Users.

3.7. Each party represents, warrants and covenants to the other that: (i) such party has full power and authority to enter into this Agreement and that this Agreement will not conflict with, result in a breach of, or constitute a default under any other agreement to which such party is a party or by which such party is bound or laws applicable to such party's obligations under this Agreement, and (ii) this Agreement is a legal and valid obligation binding upon such party and enforceable in accordance with its terms.

**4. Warranty Disclaimer**. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, EACH CUSTOM REPORT IS PROVIDED WITH NO OTHER WARRANTIES OF ANY KIND, AND EACH PARTY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND JUMPSHOT DOES NOT WARRANT THAT THE USE OF THE CUSTOM REPORT DOWNLOAD WILL BE UNINTERRUPTED OR ERROR-FREE.

**5. Term of Agreement**. Unless earlier terminated as set forth in Section 4, the term of this Agreement shall begin on the first Start Date set forth in the Work Order first entered into by and between the Parties and shall remain in effect until the last End Date with respect to such Work Order or subsequent Work Order(s), if applicable (the "**Term**").

**6. Payments; Revenue Share**.

6.1. Customer shall pay to Jumpshot, and Customer shall be entitled to retain for itself, the applicable percentages of Revenue set forth as its respective "Revenue Share" in each Work Order (the "**Revenue Share**"). "**Revenue**" means (1) the aggregate amount of licensing fees or sales revenues that Customer is paid by, and actually receives from Customer Users of Customer who license or purchase Compilation Reports, net of any and all taxes that Customer collects and remits, or is otherwise required to collect and remit, in respect of the license, sale and/or resale of the Compilation Works.

6.2. The Revenue Share will be based on Customer's records of Syndications. Jumpshot may inspect Customer's relevant records with respect to Syndications, in order to determine whether or not Customer shall have paid to Jumpshot all amounts owing to Jumpshot under this Agreement, not more frequently than once per year upon thirty (30) days' prior written notice, at Jumpshot's cost. If, following such inspection, such inspection reveals that Customer has failed to make required payments to Jumpshot by more than 5% over the audit period under this Agreement, Customer will promptly pay Jumpshot's reasonable out-of-pocket costs for the audit.

6.3. Customer must pay a finance charge on the unpaid amount of any overdue payment of one and one-half percent (1-1/2%) for each month or portion of a month that the payment is overdue, or the highest interest rate permitted by applicable law, whichever is the lower. Interest shall compound monthly. The Production Fee and the Revenue Share do not include any taxes due or owing on sales of the Compilation Works and Customer shall be responsible for any such taxes. Customer shall bear all of Jumpshot's costs of collection of overdue fees, including reasonable

attorneys' fees.  Each Party is responsible for timely and accurate reporting of, and timely payment, its own applicable income taxes relative to its income from this Agreement and the transactions contemplated hereby.  Jumpshot is responsible for timely and accurate reporting of, and timely payment of, all sales taxes required to be collected, reported, remitted and/or paid in connection with the license of Custom Reports to Customer pursuant to this Agreement.  Customer or Customer Users are responsible for timely and accurate reporting of, and timely payment of, all sales and use taxes required to be collected, reported, remitted and/or paid in connection with the license, sale and/or resale of Compilation Works to Customer Users pursuant to this Agreement.

## 7.  Termination and Suspension.

7.1.  Either Party may terminate any or all rights granted under any Work Order and/or may terminate this Agreement or a Custom Reports, if (i) the other breaches any material term of such Work Order (including a material term of this Agreement insofar as it applies to such Work Order) or breaches a material term of this Agreement and the breach is not cured within thirty (30) days following receipt of written notice; (ii) the other Party ceases to function as a going concern or to conduct its operations in the normal course of business; or (iii) receivership, bankruptcy or insolvency proceedings are commenced by or against the other Party, or an assignment for the benefit of creditors of the other Party occurs, or upon the voluntary winding up or liquidation of the other Party's business by the other Party.

7.2.  In addition, this Agreement, and any Work Order, may be terminated by Customer upon written notice to Jumpshot following receipt by Customer of a Restriction Notice, provided Customer has provided a timely Diminution Notice and fulfills the obligations and procedures set forth for termination pursuant to Section 2.2.

7.3.  Instead of terminating rights granted to a Customer under a Work Order if so entitled pursuant to Section 6.1, Jumpshot may suspend Customer's access to the applicable Custom Report download for a period of up to forty-five (45) days.  At any time during that period, Jumpshot may terminate the rights granted to Customer pursuant to an applicable Work Order.

7.4.  Sections that by their terms are intended to survive shall survive the expiration or termination of this Agreement and/or any Work Order, including without limitation, Sections 1.2, 1.3, 1.4, 1.5, 2.3, 5, 6.4, 7, 8, 9, 10, and11, shall so survive.  In addition, the rights (including licenses) and obligations of the Parties pursuant to this Agreement and each Work Order will continue in effect after the termination or expiration of this Agreement and/or any Work Order, as though the Term continued, with respect to each agreement entered into during the Term between Customer and a Customer User with respect to a Compilation Work, for a term not to exceed twelve months from the date of the applicable Customer User agreement  (a "**Customer Contract**") and pursuant to which Customer has any continuing obligations, until the latest date of termination or expiration of any such Customer Contract.

## 8.  Limitation of Liability.  EXCEPT (A) PURSUANT TO SUCH PARTY'S INDEMNIFICATION OBLIGATIONS IN THIS AGREEMENT, OR (B) IN THE CASE OF SUCH PARTY'S FRAUD OR ANY OTHER INTENTIONAL BREACH OF ITS OBLIGATIONS UNDER THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATON DAMAGES FOR LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, LOST OR CORRUPTED CUSTOM REPORT, LOST PROFITS, LOST BUSINESS OR LOST OPPORTUNITY), OR ANY OTHER SIMILAR DAMAGES UNDER ANY THEORY OF LIABILITY (WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR ANY OTHER THEORY), EVEN IF THE OTHER PARTY HAS BEEN INFORMED OF THIS POSSIBILITY, AND EXCEPT FOR AMOUNTS PAYABLE TO JUMPSHOT OR CUSTOMER'S BREACH OF SECTION 1 OR 2, EACH PARTY'S TOTAL

LIABILITY FOR ANY DIRECT LOSS, COST, CLAIM OR DAMAGES OF ANY KIND UNDER THIS AGREEMENT SHALL NOT EXCEED THE AMOUNT OF THE FEES PAID OR PAYABLE BY CUSTOMER TO JUMPSHOT DURING THE 12 MONTHS BEFORE THE EVENT GIVING RISE TO SUCH LOSS, COST, CLAIM OR DAMAGES.

9. **Confidentiality**.

9.1. Each Party anticipates that it will disclose certain Confidential Information to the other Party in connection with performance under this Agreement. Each Party agrees to preserve the confidentiality of such Confidential Information of the other Party and not to use or disclose such Confidential Information, except during the Term and thereafter for the purposes of rendering performance under this Agreement or enforcing a Party's rights under this Agreement or as permitted in Section 9.3. Each Party shall treat the other Party's Confidential Information with at least the same degree of care that it accords its own Confidential Information of a similar nature; provided, however, that in no event shall such care be less than that which is reasonably required to protect the Confidential Information.

9.2. As used herein, the term "**Confidential Information**" shall mean all data and information of a non-public or proprietary nature, as well as information that one Party knows or should know that the other Party regards as confidential, including trade secrets and other information relating to a Party's business, affairs, customers (in the case of Customer, including its Customer Users), potential customers, suppliers, know-how, development plans or projects, software, and products and services (in the case of Customer, including the Compilation Works)   Confidential Information may be communicated orally, in writing or in any other recorded or tangible form. "Confidential Information" does not include any information that (i) is now, or subsequently becomes, through no act or failure to act on the part of the receiving Party, generally known or available; (ii) is known by the receiving Party at the time of receiving such information, as evidenced by the receiving Party's records; (iii) is subsequently provided to the receiving Party by a third party, as a matter of right and without restriction on disclosure; or (iv) is required to be disclosed by law, provided that the Party to whom the information belongs is given prior written notice of any such proposed disclosure

9.3. The Parties acknowledge and agree that each of them may (in its capacity as the receiving Party) disclose Confidential Information of the other Party (in its capacity as the disclosing Party): (a) as required by applicable law or governmental or judicial order or decree; (b) to their respective directors, officers, employees, attorneys, accountants or other professional advisors and to prospective investors or purchasers in connection with a pending investment in or acquisition of such receiving Party (each, a "**Representative**") who are under an obligation of confidentiality no less stringent than that set forth herein, on a "need-to-know" basis for purposes of performing this Agreement; provided that such receiving Party shall ensure that its Representatives comply with such receiving Party's obligations pursuant to this Section 9 by any of its Representatives.  In the event that the receiving Party is ordered to make available the other Party's Confidential Information pursuant to applicable law or governmental or judicial order or decree, the receiving Party shall promptly notify the other Party of such fact (if permitted to do so under applicable law) and take reasonable steps, at the disclosing Party's request and expense, to assist the disclosing Party in contesting such request or requirement, or obtaining a protective order.

10. **Indemnification**.

10.1. Jumpshot must indemnify Customer from and against all claims, damages, losses, liabilities, costs or expenses, including any damages finally awarded against Customer or agreed to in settlement (and including reasonable costs and legal fees incurred by Customer) arising out of any third party suit, claim or other legal action that the use of any Custom Report by Customer infringes any legally enforceable right of privacy or confidentiality ("**Legal Action**").  Jumpshot must also assume the defense of the Legal Action.

10.2. However, Jumpshot shall have no indemnification obligations for any Legal Action arising out of: (i) a combination of the Custom Report with material not supplied, or approved in writing by Jumpshot; (ii) any modification or alteration of the Custom Report by Customer or any third party, unless approved in writing by Jumpshot; or (iii) any refusal by Customer to use a non-infringing version of the Custom Report offered by Jumpshot under Section 3.3.  Section 3.3 and this Section 10 state the entire liability of Jumpshot with respect to any infringement by the Custom Report of privacy or confidentiality rights.

10.3. Customer must give written notice to Jumpshot of any Legal Action no later than thirty (30) days after first receiving notice of a Legal Action.  Customer must give copies to Jumpshot of all communications, notices and or other actions relating to the Legal Action.  Customer must give Jumpshot the sole control of the defense of any Legal Action and must give Jumpshot such assistance as Jumpshot reasonably requests to defend or settle such claim. Jumpshot must conduct its defense at all times in a manner that is not adverse to Customer's interests and may permit Customer's reasonable participation, at Customer's own expense, in the defense and any settlement of such Legal Action. Customer may employ its own separate counsel to assist it with respect to any such claim.  Customer must bear all costs of engaging its own counsel, unless engagement of counsel is necessary because of a conflict of interest with Jumpshot or its counsel, or because Jumpshot fails to assume control of the defense.  If Jumpshot fails to assume control of the defense of the Legal Action, Customer must not settle or compromise any Legal Action without Jumpshot's express written consent. Jumpshot shall be relieved of its indemnification obligation under Section 10.1 to the extent Customer materially fails to comply with Section 10.3.

10.4. Customer must indemnify Jumpshot from any damages finally awarded against Jumpshot or agreed to in settlement (including reasonable costs and legal fees incurred by Jumpshot) arising out of any third party suit, claim or other legal action (including any governmental investigations, complaints and actions) in connection with Customer's use of any Custom Report, excluding to the extent the Legal Claim is based on any Custom Report to which Section 3.3 or 3.4 may apply ("**Legal Claim**").  Customer must also assume the defense of the Legal Action.

10.5. Jumpshot must give written notice to Customer of any Legal Claim no later than thirty (30) days after first receiving notice of a Legal Claim.  Jumpshot must give Customer the opportunity to control the defense of any Legal Claim and must give Customer such assistance as Customer reasonably requests to defend or settle such claim. Customer must conduct its defense at all times in a manner that is not adverse to Jumpshot's interests and must permit Jumpshot's reasonable participation, at Jumpshot's own expense, in the defense and any settlement of such Legal Claim. Jumpshot may employ its own separate counsel to assist it with respect to any such claim. Jumpshot must bear all costs of engaging its own counsel, unless engagement of counsel is necessary because of a conflict of interest with Customer or its counsel, or because Customer fails to assume control of the defense.  Customer must not settle or compromise any Legal Claim without Jumpshot's express written consent.

## 11. Miscellaneous.

11.1. This Agreement, together with each Work Order and the Work Order Terms and Conditions, represents the entire agreement of the Parties, and supersedes any prior or current understandings, whether written or oral.  If there is a conflict between the Agreement and/or the Work Order Terms and Conditions and the remainder of any Work Order, the Agreement and/or the Work Order Terms and Conditions, as applicable, will prevail.

11.2. This Agreement may not be changed or any part waived except in writing by the Parties. All modifications to a Work Order will be set forth in a mutually agreed to change order signed by the Parties.

11.3. This Agreement will be governed by the laws of California (excluding its choice of law rules). The Parties consent to the exercise of exclusive jurisdiction by the state or federal courts in the State of California for any claim relating to this Agreement.

11.4. Each Party must not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party; provided that either Party may assign this Agreement to a subsidiary or to an acquirer of its business or assets, in whole or in part, in either case, without the consent of the other Party. Any assignment in breach of this Section 11.4 is void. This Agreement, and the rights and obligations of the Parties hereto, shall be binding upon, and insure to the benefit of, the successors and permitted assigns of the Parties.

11.5. The Parties are independent contractors and nothing contained in this Agreement shall be construed to constitute the Parties as partners, joint ventures, co-owners or otherwise in a joint or common undertaking. Neither Party shall have authority to act for or on behalf of the other Party.

11.6. All notices required or permitted by this Agreement shall be in writing and shall be deemed to have been made upon delivery, if delivered personally; when sent, if transmitted via fax or email (in each case, with confirmation of transmission); or two (2) business days after deposit with a nationally-recognized overnight courier, in each case, to the receiving Party's address, email address or fax number set forth on the Work Order last entered into by and between the Parties, or to such other address, email address or fax number as a Party may specify in accordance with this Section 11.6.

11.7. Should any portion of this Agreement or any Work Order be found to be invalid in any court of competent jurisdiction, then that portion of this Agreement or such Work Order shall be stricken, with all other remaining portions of this Agreement and such Work Order continuing in full force and effect.

11.8. In this Agreement, words denoting the singular include the plural and vice versa and words denoting any gender include all genders; "business day" means any day other than a Saturday, Sunday, or a day that is a statutory holiday under the laws of the United States or the State of California; all references to statutes or regulations are deemed to refer to such statutes and regulations as amended from time to time or as superseded by comparable successor provisions; and the word "including" shall be deemed to mean "including, without limitation".

11.9. Customer must not export or re-export, directly or indirectly, any Custom Report or confidential information to any countries outside the United States except as permitted under the U.S. Commerce Department's Export Administration Regulations.

11.10. The Custom Report provided to the U.S. Government is "Limited Rights Data" as defined in 48 C.F.R. 52.227-14 Alternate I and the Government takes a license to the Custom Report consistent with 48 C.F.R. 52.227-14 Alternate II and with only the same rights granted to all other licensees pursuant to the terms and conditions of this Agreement. "The Custom Report are submitted with limited rights to the Government. This Custom Report may be reproduced and used by the Government with the express limitation that they will not, without written permission of the Contractor, be used for purposes of manufacture nor disclosed outside the Government."

# EXHIBIT 2

Work Order Terms and Conditions

1. These Terms and Conditions govern, and form a part of, each Work Order entered into by mutual written agreement of the parties hereto pursuant to the Data Services Agreement, dated June 1st 2016, by and between Jumpshot, Inc. and Deals Way Ltd. (as amended from time to time, the "**Agreement**").  Capitalized terms used herein but not defined have the meanings given thereto in the Agreement or, if not defined therein, in each Work Order.

2. The term of the Work Order will start on the Start Date, and will expire on the End Date. The Parties may renew the services provided pursuant to a Work Order by entering into an additional Work Order with respect to time periods following the End Date. At "**End Date**", Customer may no longer sell Syndications to new Customer's Users or new Syndications to existing Customer's Users.  However, any Syndications sold to Customer's Users on or before the End Date, Jumpshot will provide the Custom Report for such Syndication for up to twelve months from the date the Syndication was first sold to an applicable Customer's Users(s).

3. Each Custom Report will be available for download by Customer in accordance with the download frequency, after Jumpshot receives the Production Fee.

4. Any terms and conditions on your purchase order if applicable in addition to or in conflict with or on a Work Order in conflict with these Work Order Terms and Conditions or the Agreement are void and have no legal effect.

5. The Production Fee will be invoiced upon execution of a Work Order or upon renewal of a Work Order and will be due within thirty (30) days from the date of invoice.  The Production Fee is a one-time fee under the Work Order and a one-time fee under a renewal of a Work Order, due and payable by Customer not more than once during the period from and including the Start Date set forth on a Work Order or renewal Work Order until and including the applicable End Date.

6. Within ten (10) days following the end of each month, Customer will provide Jumpshot a written report with a list of Custom Reports and the total related Custom Report fees actually received by Customer from Customer Users during such month.  The Revenue Share for the Custom Reports will then be invoiced by Jumpshot and will be due within thirty (30) days from date of invoice.  Customer may, in its discretion, offset the Production Fee paid to Jumpshot against any Revenue Share amounts otherwise due and payable to Jumpshot.

7. Except as set forth in the Agreement, the fees listed above are nonrefundable and are exclusive of all taxes, levies, or duties imposed by taxing authorities.

8. Customer agrees not to disclose the Work Order Terms and Conditions to any third party.

9. Revenue Share.  The Revenue Share is defined in the Agreement.

| Jumpshot, Inc. | Customer: Deals Way Ltd. |
|---|---|
| DocuSigned by: *Deren Baker* — 0CDBD6F060164A7 | |
| Authorized Signature: | Authorized Signature: |
| Name: Deren Baker | Name: Yuval Yifrach |
| Title: CEO | Title: CEO |
| Signature Date: 6/2/2016 | Signature Date: |

# EXHIBIT 3

# WORK ORDER

The following work order ("Work Order") is governed by the terms and conditions set forth in the Data Services Agreement ("Agreement") dated June 1st, 2016 between Jumpshot, Inc. and Deals Way Ltd. (d/b/a) Market Beyond ("Customer").

| Customer Information Form | | | | | |
|---|---|---|---|---|---|
| Customer name: | Deals Way Ltd. (d/b/a) Market Beyond ("**Customer**") | | | | |
| Primary Contact: | Yuval Yifrach | Phone: | 972 54 314 1115 | Email: | yuval@themarketbeyond.com |
| Technical Contact: | Eran Dror | Phone: | 972 54 4438 037 | Email: | Eran@themarketbeyond.com |
| Customer Billing Address: | Hanegev 63 Yavne, , Israel | PO: | | Account Manager: | Eli Goodman |
| Customer Billing Email Address: | invoices@themarketbeyond.com | | | | |

| Full Fee Production (Production) | | | |
|---|---|---|---|
| Start Date: | May 1st, 2019 | End Date: | April 30th, 2020 |
| Production Fee: | $290,000 (which includes the remaining $77,500 unused from the previous work order dated April 30th, 2018). The total Production Fee includes and should be used by Customer as follows: <ul><li>$25,000: Amazon.com.au and Ebay.com.au Insights Feeds</li><li>$70,000: 3 Custom Amazon browse node event reports</li><li>$195,000: annual commitment to purchase additional Insights feeds based on pricing table below</li><li>$54,375 of the annual commitment must be spent by June 1, 2019. Additionally, $101,250 of the annual commitment must be spent by October 31, 2019, $148,125 must be spent by December 31, 2019 and $195,000 must be spent by April 30, 2020.</li></ul> **Pricing table for additional Insights Feeds:** | | |

DocuSign Envelope ID: D4928855-72AC-4027-A428-38B06174186D

The Geo Tier prices are per country from the defined region:

| Geo Tier | Site Tier | | |
|---|---|---|---|
| | 1 (Amazon Only) | 2 | 3 |
| 1 (United States) | N/A | $15,000 | $10,000 |
| 2 (EU West) | $25,000 | $15,000 | $10,000 |
| 3 (Rest of World) | $15,000 | $10,000 | $7,500 |

**If Customer executes a separate work order with Jumpshot to purchase Google Search + Click Feeds, the annual prices are as follows.  For Google Search + Click, 1 year Historical data + 1 year of future data = 2 years of data. These can also be licensed in monthly increments if needed.**

| Geo Tier | Google Search + Click - Annual Pricing | Google Search + Click - Monthly Pricing |
|---|---|---|
| Worldwide | $750,000 for 1 year of Historical data or for 1 year of Future data. | $62,500 per month of either Historical or Future Data |
| 1 (United States) | $250,000 for 1 year of Historical data or for 1 year of Future data. | $22,000 per month of either Historical or Future Data |
| 2 (EU West) | $100,000 for 1 year of Historical data or for 1 year of Future data. | $10,000 per month of either Historical or Future Data |
| 3 (Rest of World) | $50,000 for 1 year of Historical data or for 1 year of Future data. | $6,000 per month of either Historical or Future Data |

If Customer executes a separate work order to purchase Amazon DE or eBay DE, the annual prices are as follows:

- Amazon DE:  $37,500.
- eBay DE:  $25,000.

| Currency: | USD | Payment Terms: | Quarterly invoices of $23,750 beginning on 5/1/2019.

Each Insights Feed requested will be billed for it's full value upfront on the Deliverable Acceptance Date (defined below in the Specific Terms).

In the event that Customer does not achieve its committed spend by the target dates Jumpshot |

| | | | will invoice Customer for any unused amounts on July 1, 2019, November 1, 2019, January 1, 2020 and May 1, 2020.<br><br>Payment is due Net 30 days of receipt of invoice. |
|---|---|---|---|

| **Deliverable Specific Terms** | |
|---|---|
| Deliverable Name: | Insights Feed |
| Country List: | Global, Australia (AU) |
| File Format: | Ctrl-A Delimited Text |
| Download Frequency: | Daily |
| Delivery Method: | Amazon S3 |
| Specific Terms: | Deliverable descriptions:<br><br>All feeds run against Jumpshot's Full Panel.<br><br>**Insights Feeds**<br><br>Domains:<br>• amazon.com.au<br>• ebay.com.au<br><br>Tier Definitions:<br><br>Tier 1:  Amazon domains only<br>Tier 2:  All domains that have over 10,000 raw unique devices in the Jumpshot panel to their website in a given month<br>Tier 3:  All other domains<br><br>YouTube, Facebook, Netflix, Yahoo, Yandex, Bing, Twitter, Instagram, `Snapchat, and other social networks and search engines are exempt as our standard Insights Feed definitions do not apply<br><br>Amazon US, UK and eBay US, UK are exempt from this SOW.<br><br>Jumpshot will provide Customer the Insights Feed product based on the following: |

DocuSign Envelope ID: D4928855-72AC-4627-A426-33B0617A186D

- Duration: 12 months from the Deliverable Acceptance Date (defined below) for each Insights Feed, with one year historical data supplied at feed inception, with daily delivery going forward.
- Samples:
- For domains that Jumpshot has already discovered, samples will be delivered within 10 business days.
- For domains that have not been discovered by Jumpshot, samples will be delivered within 25 business days.
- Samples for domains that are already discovered up to 14 days in length will be at no cost
- Samples for domains that are already discovered for over 14 days in length can only be purchased in 3 month increments.  The price will be a pro-rated rate from the Site Tier pricing grid plus a 25% service fee
- Samples for domains yet to be discovered can only be purchased in 3 month increments.   The price will be a pro-rated rate from the Site Tier pricing grid plus a 25% service fee

**Data Delivery and Retention**
- Deliverables will be compressed and delivered to a Jumpshot S3 location in Europe.
- S3 credentials will be provided to Customer separately
- Data will be retained on s3 for 30 days.
- For Insights Feed domains that Jumpshot has already discovered, deliverable will be delivered within 15 business days.
- For Insight Feed domains that have not been discovered by Jumpshot, deliverable will be delivered within 25 business days
- Jumpshot will guarantee the delivery of all feeds within 24 hours of the previous day based on UTC

Deliverable Acceptance
- **Acceptance Criteria.**  The "Acceptance Criteria" are the specifications the Deliverable must meet for Jumpshot to comply with its requirements and obligations of each Deliverable detailed within the Specific Terms of this Work Order.
- **Inspection and Notice**.  Customer will have up to ten (10) business days from the delivery date to inspect and evaluate the Deliverable before notifying Jumpshot in writing that it is either accepting or rejecting the Deliverable if the Deliverable does not satisfy the Acceptance Criteria.
- **Delivery Acceptance Date**. The Delivery Acceptance Date for each Deliverable will be the earlier of the Customer's notification that it is accepting the Deliverable or the inspection and notice time frame as outlined in Inspection and Notice above. The Delivery Acceptance Date will determine the Start Date of each Deliverable under this Work Order.

**Insights Feeds Description:**

| Column Name | Format |
|---|---|
| Date | YYYYMMDD (UTC) |

| | | |
|---|---|---|
| | Time | HHIISS (UTC) |
| | Timestamp | Millisecond precision unix timestamp (UTC) |
| | Device ID | Customer-specific hashed distinct device ID |
| | Domain | ie. ebay.com |
| | Platform | PC or Mobile |
| | Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |
| | Event Type | Event names where applicable:<br>• On-site Search<br>• Product Page<br>• Add to Cart<br>• Start Checkout<br>• Conversion<br><br>Limited support<br>• Streaming<br>• Account sign in<br>• Product review<br>• |
| | PII Stripped URL | • Protocol, Host and Path by default<br>• Product pages will contain the Query portion of the URL when made available to Jumpshot from the source data |
| | Extracted Search Value | The keyword or phrase searched |
| | City | City derived from IP and provided when available |
| | State/Province | State/Province derived from IP and provided when available |
| | Country Code | A two-character ISO 3166 Country code derived from IP |
| | Age | Inferred Socio Demo provided when a determination can be made<br><br>● <18<br>● 18-24<br>● 25-34<br>● 35-44<br>● 45-54 |

DocuSign Envelope ID: D4928855-72AC-4627-A48D-39B061F11860

| | |
|---|---|
| | ● 55-64<br>● 65+<br>● U-Undetermined |
| Gender | Inferred Socio Demo provided when a determination can be made<br><br>● F - Female<br>● M - Male<br>● U – Undetermined |
| Domain Session Referrer | The URL of a previously visited domain that preceded the visit to the marketplace domain during this domain session |
| Source | Hashed source ID |

**Calibration Coefficients**

Daily calibration coefficients will be provided for contracted domains and for the related countries for those domains when available.

Calibration coefficients are a set of multipliers to project Jumpshot data to represent real world populations. They are grouped by Country, Platform, and Date. Therefore, for each combination of Date, Country, and Platform, two multipliers are supplied. One multiplier is to project the number of unique visitors while another is to project the number of page views.

The following definition for a generalized calibration coefficient is as follows:

| Column Name | Column Type | Description |
|---|---|---|
| Date | String | YYYYMMDD Format |
| Country Code | String | A two-character ISO 3166-1 Country Code |
| Platform | String | Desktop/Mobile |
| UV Coefficient | Double | Multiplier for Unique Visitor Counts |
| PV Coefficient | Double | Multiplier for Page View Counts |

In some instances, calibration coefficients may be available for a particular domain. This is only for a fixed, limited set of domains. An additional domain column is included in the delivery:

| Column Name | Column Type | Description |
|---|---|---|
| Date | String | YYYYMMDD Format |
| Domain | String | Domain to apply coefficients to |
| Platform | String | PC/Mobile |
| Country Code | String | A two-character ISO 3166-1 Country Code |

DocuSign Envelope ID: D4928855-72AC-4827-A426-33B061741860

| UV Coefficient | Double | Multiplier for Unique Visitor Counts |
|---|---|---|
| PV Coefficient | Double | Multiplier for Page View Counts |

**Monthly Panel Metrics**
Delivery Cadence: Monthly

| Column Name | Value |
|---|---|
| Year | YYYY |
| Month | MM |
| Platform | Desktop or Mobile |
| Country Code | • A two-character ISO 3166<br>• Country code derived from IP |
| Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |
| Unique Devices | The number of unique devices |
| Page Views | The number of page views |

**Daily Panel Metrics**

| Column Name | Value |
|---|---|
| Year | YYYY |
| Month | MM |
| Day | DD |
| Platform | Desktop or Mobile |
| Country Code | • A two-character ISO 3166<br>• Country code derived from IP |
| Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |
| Unique Devices | The number of unique devices |
| Page Views | The number of page views |

**Browse Nodes Custom Event Report**
Domains:
- Amazon.com
- Amazon.co.uk
- Amazon.com.au

Three custom events, described below, will be captured and reported on by Jumpshot. The data will be delivered on a daily basis, with one year of historical data included at feed inception.
**Best Sellers and/or Sample:**
These are identified by the /zgbs/ tag in the URL.
sample URL: https://www.amazon.com/Best-Sellers-Electronics-HDMI-Cables/zgbs/electronics/202505011

DocuSign Envelope ID: D4928855-72AC-4627-A42E-33D061741860

**Top Selected Products and Reviews:**
These are identified by the /slp/ tag in the URL
sample URL: https://www.amazon.com/slp/cheap-smartphones/svq9xz5mrtz97bk

**Category Browse:**
Browse nodes are usually marked by the Node= URL parameter.

samples can be seen here:
https://www.amazon.com/b/?node=17386948011

https://www.amazon.com/b/?_encoding=UTF8&node=10509650011&bbn=7141123011&ref_=Oct_Cate
C_679425011_0&pf_rd_p=3659afeb-2571-5ccb-bf03-768296eeea9f&pf_rd_s=mobile-hybrid-
4&pf_rd_t=30901&pf_rd_i=679425011&pf_rd_m=ATVPDKIKX0DER&pf_rd_r=SS5VB2GZ29DN14C7RF
Q2&pf_rd_r=SS5VB2GZ29DN14C7RFQ2&pf_rd_p=3659afeb-2571-5ccb-bf03-768296eeea9f

https://www.amazon.com/b/?node=679425011&ref_=Oct_CateC_679337011_0&pf_rd_p=0
b79cfcb-2cb7-59ab-a9e6-31140bbb8f76&pf_rd_s=mobile-hybrid-
4&pf_rd_t=30901&pf_rd_i=679337011&pf_rd_m=ATVPDKIKX0DER&pf_rd_r=RR7PFV2M
MQRVXGCCT1N8&pf_rd_r=RR7PFV2MMQRVXGCCT1N8&pf_rd_p=0b79cfcb-2cb7-59ab-
a9e6-31140bbb8f76

**SLA Terms**

1. Jumpshot CSM will acknowledge receipt of issue via email within 24 hours (business hours)
2. Jumpshot will make best efforts to resolve issues related to issues that are in Jumpshot's control within 5 business days. This includes delivery of data to s3, feed structure and Jumpshot's data processing.
3. Jumpshot will resolve issues related to event changes made by domain owner within 14 days

**Columns:**

| Column Name | Format |
| --- | --- |
| Date | YYYYMMDD (UTC) |
| Time | HHIISS (UTC) |
| Timestamp | Millisecond precision unix timestamp (UTC) |
| Device ID | Customer-specific hashed distinct device ID |
| Domain | ie. amazon.com |
| Platform | Desktop or Mobile |
| Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |

| | Event Type | | |
|---|---|---|---|
| | | • Best Seller/Sample<br>• Top Selected Products/Reviews<br>• Category Browse | |
| | PII Stripped URL | • Protocol, Host and Path by default<br>• Category Browse event will include query portion of URL | |
| | City | City derived from IP and provided when available | |
| | State/Province | State/Province derived from IP and provided when available | |
| | Country Code | A two-character ISO 3166 Country code derived from IP | |
| | Age | Inferred Socio Demo provided when a determination can be made<br><br>• <18<br>• 18-24<br>• 25-34<br>• 35-44<br>• 45-54<br>• 55-64<br>• 65+<br>• U-Undetermined | |

| | Gender | Inferred Socio Demo provided when a determination can be made <br><br>● F - Female <br>● M - Male <br>● U – Undetermined |
| | Domain Session Referrer | The URL of a previously visited domain that preceded the visit to the marketplace domain during this domain session |
| | Source | Hashed source ID |

**JUMPSHOT, INC.**

Signature: _Michael Perlman_

Printed Name: Michael Perlman

Title: CRO

Date: 5/22/2019

**Customer**

Signature: _Yuval Yifrach_

Printed Name: Yuval Yifrach

Title: CEO

Date: 5/22/2019

# EXHIBIT 4

# WORK ORDER

The following work order ("Work Order") is governed by the terms and conditions set forth in the Data Services Agreement ("Agreement") dated June 1st, 2016 between Jumpshot, Inc. and  Deals Way Ltd. (d/b/a) Market Beyond ("Customer").

| Customer Information Form | | | | | |
|---|---|---|---|---|---|
| Customer name: | Deals Way Ltd. (d/b/a) Market Beyond  ("**Customer**") | | | | |
| Primary Contact: | Yuval Yifrach | Phone: | 972 54 314 1115 | Email: | yuval@themarketbeyond.com |
| Technical Contact: | Eran Dror | Phone: | 972 54 4438 037 | Email: | Eran@themarketbeyond.com |
| Customer Billing Address: | Hanegev 63 Yavne, , Israel | PO: | | Account Manager: | Eli Goodman |
| Customer Billing Email Address: | Invoices@themarketbeyond.com | | | | |

| Full Fee Production (Production) | | | |
|---|---|---|---|
| Start Date: | May 1, 2019 | End Date: | April 30th, 2021 |
| Production Fee: | $375,000.00 | | |
| Currency: | USD | Payment Terms: | Quarterly Payment is due Net 30 days of receipt of invoice. |

| Deliverable Specific Terms | |
|---|---|
| Deliverable Name: | Insights Feed |
| Country List: | US, UK (GB) |
| File Format: | Ctrl-A Delimited Text File |
| Download Frequency: | Daily |

| Delivery Method: | Amazon S3 |
|---|---|

| Specific Terms: | Deliverable descriptions: |
|---|---|

Deliverable descriptions:

All feeds run against Jumpshot's Full Panel.

**Insights Feeds**

Domains:
- amazon.co.uk
- amazon.com
- ebay.co.uk
- ebay.com

The feeds for the ebay domains may be swapped out to two equivalent domains prior to the expiration of this work order a total of one (1) time with 30 days of written notice provided to Jumpshot in advance. The domains that are chosen to replace the ebay domains must be of equal or lesser commercial value, with Jumpshot's sole discretion as the determinant of such.

**Data Delivery and Retention**
- Deliverables will be compressed and delivered to a Jumpshot S3 location in Europe.
- S3 credentials will be provided to Customer separately
- Data will be retained on s3 for 30 days.

**Insights Feeds Description:**

| Column Name | Format |
|---|---|
| Date | YYYYMMDD (UTC) |
| Time | HHIISS (UTC) |
| Timestamp | Millisecond precision unix timestamp (UTC) |
| Device ID | Customer-specific hashed distinct device ID |
| Domain | ie. ebay.com |
| Platform | PC or Mobile |
| Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |
| Event Type | Event names where applicable:<br>• On-site Search<br>• Product Page<br>• Add to Cart |

| | | |
|---|---|---|
| | | • Start Checkout<br>• Conversion<br><br>Limited support<br>• Streaming<br>• Account sign in<br>• Product review |
| | PII Stripped URL | • Protocol, Host and Path by default<br>• Product pages **will** contain the Query portion of the URL when made available to Jumpshot from the source data |
| | Extracted Search Value | The keyword or phrase searched |
| | City | City derived from IP and provided when available |
| | State/Province | State/Province derived from IP and provided when available |
| | Country Code | A two-character ISO 3166 Country code derived from IP |
| | Age | Inferred Socio Demo provided when a determination can<br><br>● <18<br>● 18-24<br>● 25-34<br>● 35-44<br>● 45-54<br>● 55-64<br>● 65+<br>● U-Undetermined |
| | Gender | Inferred Socio Demo provided when a determination can<br><br>● F - Female<br>● M - Male<br>● U – Undetermined |
| | Domain Session Referrer | The URL of a previously visited domain that preceded the visit to the marketplace |

| | domain during this domain session |
|---|---|
| Source | Hashed source ID |

**Calibration Coefficients**

Daily calibration coefficients will be provided for contracted domains and for the related countries for those domains when available.

Calibration coefficients are a set of multipliers to project Jumpshot data to represent real world populations. They are grouped by Country, Platform, and Date. Therefore, for each combination of Date, Country, and Platform, two multipliers are supplied. One multiplier is to project the number of unique visitors while another is to project the number of page views.

The following definition for a generalized calibration coefficient is as follows:

| Column Name | Column Type | Description |
|---|---|---|
| Date | String | YYYYMMDD Format |
| Country Code | String | A two-character ISO 3166-1 Country Code |
| Platform | String | Desktop/Mobile |
| UV Coefficient | Double | Multiplier for Unique Visitor Counts |
| PV Coefficient | Double | Multiplier for Page View Counts |

In some instances, calibration coefficients may be available for a particular domain. This is only for a fixed, limited set of domains. An additional domain column is included in the delivery:

| Column Name | Column Type | Description |
|---|---|---|
| Date | String | YYYYMMDD Format |
| Domain | String | Domain to apply coefficients to |
| Platform | String | PC/Mobile |
| Country Code | String | A two-character ISO 3166-1 Country Code |
| | | |
| UV Coefficient | Double | Multiplier for Unique Visitor Counts |
| PV Coefficient | Double | Multiplier for Page View Counts |

**Monthly Panel Metrics**

Delivery Cadence: Monthly

| Column Name | Value |
|---|---|
| Year | YYYY |
| Month | MM |
| Platform | Desktop or Mobile |

| | | |
|---|---|---|
| | Country Code | • A two-character ISO 3166<br>• Country code derived from IP |
| | Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |
| | Unique Devices | The number of unique devices |
| | Page Views | The number of page views |

**Daily Panel Metrics**

| Column Name | Value |
|---|---|
| Year | YYYY |
| Month | MM |
| Day | DD |
| Platform | Desktop or Mobile |
| Country Code | • A two-character ISO 3166<br>• Country code derived from IP |
| Browser Type | CHROME, FIREFOX, IE, SAFARI, OPERA |
| Unique Devices | The number of unique devices |
| Page Views | The number of page views |

SLA Terms

1.  Jumpshot CSM will acknowledge receipt of issue via email within 24 hours (business hours)
2.  Jumpshot will make best efforts to resolve issues related to issues that are in Jumpshot's control within 5 business days. This includes delivery of data to s3, feed structure and Jumpshot's data processing.
3.  Jumpshot will resolve issues related to event changes made by domain owner within 14 days

**JUMPSHOT, INC.**                                    **Customer**

Signature: _Michael Perlman_          Signature: _Yuval Yifrach_

Printed Name: Michael Perlman          Printed Name: Yuval Yifrach

Title: CRO                                    Title: CEO

Date: 5/16/2019                          Date: 5/16/2019

# EXHIBIT 5

# jumpshot

January 30, 2020

Dear Customer,

**Restriction of provision of data and related services under the data licensing agreement between you and Jumpshot, Inc. ("Jumpshot") and related work orders (the "Agreement")**

We refer to the Agreement.  Capitalized terms used in this notice, unless otherwise expressly defined, shall have the meanings given to them in the Agreement.

As a result of a data provider of Jumpshot, with immediate effect, no longer providing data to and imposing restrictions and prohibitions on the use of data by Jumpshot, Jumpshot hereby gives notice to you pursuant to the Agreement that with effect from the date of this notice, it is no longer able to provide to you the data feed or deliverables under the Agreement and you can no longer use such data or deliverables. As a result of this, Jumpshot therefore confirms that it will no longer have a relationship with you pursuant to which it provides data.

To the extent you have pre-paid any fees to Jumpshot for undelivered deliverables and / or services in connection with the Agreement, we will arrange for you to receive a refund of a pro-rata portion of those fees corresponding to the deliverables and / or services that you will no longer receive.

We appreciate your cooperation in managing this unexpected turn of events that is beyond our reasonable control.

Yours faithfully

Deren Baker
Jumpshot, Inc.

Jumpshot, Inc.
333 Bryant St, Suite 240
San Francisco, CA 94107

# EXHIBIT 6

# weintraub|tobin

MERITAS LAW FIRMS WORLDWIDE

**Josh H. Escovedo**
916-558-6181 DIRECT
jescovedo@weintraub.com

February 18, 2020

*Via Email – deren.baker@jumpshot.com, and Golden State Overnight,*
   *for delivery next business morning*

Mr. Deren Baker
Chief Executive Officer
JUMPSHOT, INC.
333 Bryant Street, Suite 240
San Francisco, California   94107

*Via Golden State Overnight, for delivery next business morning*

Mr. Ondrej Vlcek
Chief Executive Officer
AVAST SOFTWARE, INC.
2625 Broadway Street
Redwood City, California   94063

   Re:   Breach of the Data Services Agreement Dated June 1, 2016

Dear Messrs. Baker and Vlcek:

Our office represents Deals Way Ltd., doing business as Market Beyond ("Market Beyond"). We write regarding Jumpshot, Inc.'s ("Jumpshot") recent breach of the Data Services Agreement dated June 1, 2016 (the "Agreement"), and the corresponding work orders. It is our intent, through this correspondence, to resolve this matter without protracted litigation. However, if you are unwilling to rectify the breach, we have been authorized to commence litigation.

**weintraub tobin** chediak coleman grodin law corporation

400 Capitol Mall, 11th Floor, Sacramento, California 95814 | (916) 558.6000 | F (916) 446.1611 | www.weintraub.com
{2815970.DOCX;}

Mr. Deren Baker
Mr. Ondrej Vlcek
February 18, 2020
Page 2 of 3

As you know, pursuant to the Agreement, you are required to provide Market Beyond with certain data services deliverables, as more extensively described in the work orders dated May 16, 2019 and May 22, 2019 (the "Work Orders"). Based upon Mr. Baker's letter dated January 30, 2020, however, it is apparent that Jumpshot does not intend to satisfy its obligations under the Agreement and the Work Orders.

Jumpshot's decision to cease providing the agreed-upon data services deliverables constitutes an intentional breach of the Agreement and the Work Orders. As such, the Limitation of Liability provision set forth in section 8 of the Agreement does not apply, creating significantly more exposure for Jumpshot.

As a result of Jumpshot's conduct, Market Beyond has been significantly damaged. Specifically, Market Beyond will now be unable to satisfy numerous agreements it has entered into with various other entities, requiring Market Beyond to renegotiate those agreements, at the mercy of the other parties to those agreements, or face potential liability for breach of contract. Regardless of whether it is able to renegotiate these agreements and avoid any potential liability, Market Beyond's reputation in the industry will suffer, resulting in a substantial loss of goodwill. As of this time, and without waiver of Market Beyond's right to increase its claim after further investigation, Market Beyond estimates its damages exceed $5 million.

Market Beyond also has reason to believe that Jumpshot is the alter ego of Avast Software, Inc. Accordingly, Market Beyond intends to pursue both entities if this matter cannot be satisfactorily resolved at this juncture. Currently, Market Beyond is willing to resolve this matter for a total of $2 million. We have read that Jumpshot intends to continue paying its vendors during the winding-up process. We hope that Jumpshot also intends to pay its customers for unperformed services and consequential damages. Alternatively, if Jumpshot decides to reconvene doing business, Market Beyond remains open to doing business with Jumpshot. Either way, Market Beyond's offer will remain open until the close of business on **Friday, February 21, 2020.**

**weintraub tobin** chediak coleman grodin law corporation

400 Capitol Mall, 11th Floor, Sacramento, California 95814 | (916) 558.6000 | F (916) 446.1611 | www.weintraub.com
{2815970.DOCX;}

Mr. Deren Baker
Mr. Ondrej Vlcek
February 18, 2020
Page 3 of 3


If you have any questions or concerns, please feel free to contact me. Thank you for your anticipated cooperation.

Very truly yours,

**weintraub | tobin**

Josh H. Escovedo


JHE/ens

**weintraub tobin** chediak coleman grodin law corporation

400 Capitol Mall, 11th Floor, Sacramento, California 95814 | (916) 558.6000 | F (916) 446.1611 | www.weintraub.com
{2815970.DOCX;}

# EXHIBIT 7

DocuSign Envelope ID: 3440867C-83DF-4A09-963C-7C41DF0952B5

Deren Baker
Chief Executive Officer
Jumpshot, Inc.
PO Box #78071
San Francisco CA 94107


February 24, 2020


Josh H. Escovedo
Weintraub Tobin Law Corporation
400 Capitol Mall, 11th floor
Sacramento, California 95814
916 558 6000
916 446 1611 Fax


VIA EMAIL – jescovedo@weintraub.com

Dear Mr. Escovedo:

I write in response to your letter dated February 18, 2020 regarding Jumpshot's recent cessation of operations as a result of the decision by its primary data supplier, Avast Software s.r.o. ("Avast"), to cease its provision of data to Jumpshot.

On January 30, 2020, Avast notified Jumpshot that it was imposing a prohibition on Jumpshot's use of the data in accordance with the terms of the license agreement entered into between the parties such that: (1) Jumpshot was prohibited from using the data it had previously received from Avast, and (2) Jumpshot would not receive any further data from Avast. Upon receiving this notification, Jumpshot notified its customers that it would be imposing an equivalent prohibition on the data provided to them, and that Jumpshot would be ceasing operations with immediate effect due to matters outside of its control.

As explained during the negotiations with your client, Deals Way Ltd., doing business as Market Beyond ("Market Beyond"), Jumpshot did not own the data underlying its products and services, but directly licensed it from Avast. In acknowledgement of the fact that Jumpshot relied on an external data supplier, and in contemplation of a scenario such as this, Market Beyond agreed to Section 2.2 of the Data Services Agreement entered into with Jumpshot dated June 1, 2016 ("**DSA**"), which reads:

> "*2.2. Jumpshot may, at any time, request restrictions and/or prohibitions on the use of the Custom Reports, to the extent that substantially identical restrictions are imposed on Jumpshot by third parties, including, without limitation local, state or federal statutes or*

DocuSign Envelope ID: 3440867C-83CF-4089-963D-7C94DE9B52B5

*regulations; judicial or regulatory interpretations thereof; or contractual obligations placed upon Jumpshot by its data source providers. In such event, Jumpshot shall provide Customer prompt written notice (a "Restriction Notice") of such restrictions or prohibitions, and Customer shall promptly comply with such restrictions or prohibitions, but in each case no later than within thirty (30) days following receipt of the Restriction Notice. If Customer reasonably believes that such restrictions or prohibitions are reasonably likely to materially affect Customer's rights under this Agreement or any Work Order, including with respect to any Custom Report(s), Customer may provide Jumpshot with a notice (a "Diminution Notice"); provided that the Diminution Notice is received by Jumpshot within thirty (30) days after receipt of the Restriction Notice. In the event that Customer provides Jumpshot a Diminution Notice, the Parties shall work together in good faith to determine a mutually agreed adjustment to the Revenue Share or other terms of this Agreement or any Work Order during the subsequent thirty (30) day period. If the Parties are not able to negotiate a mutually acceptable amendment to this Agreement or such Work Order within such thirty (30) day period, then Customer may terminate this Agreement and/or any Work Order, or any portion thereof, upon written notice to Jumpshot."*

Section 2.2 of the DSA clearly contemplates a scenario in which a prohibition on the use of data could be imposed on Market Beyond by Jumpshot where similar restrictions are placed upon Jumpshot by its data source provider. Further, it provides for a redress mechanism in such a situation. With our offer to repay all pre-paid fees under the DSA, we have agreed to adjust the fees for the affected deliverables after January 29, 2020 to nil. We therefore completely refute your accusation that Jumpshot has breached the DSA, willfully or otherwise. Jumpshot has merely exercised a right available to it under the DSA.

Finally, your assertion that Avast is an alter-ego of Jumpshot is completely untrue and without basis. Jumpshot was only part-owned by Avast at the time Avast made the decision to cease the provision of data to Jumpshot, with a third party unrelated to the Avast group also holding a significant stake. The Board of Jumpshot comprised of representatives from each of these investors, and I also held a position on the Board as an independent appointee. Jumpshot was run as a standalone business to Avast, with its own independent decision-making body. Jumpshot's intention was to continue supplying its products and services to new and existing customers, with a view to building long-term and mutually beneficial relationships. The decision was made unilaterally by Avast to terminate its data sharing relationship with Jumpshot, which has resulted in the circumstances in which Jumpshot finds itself today. Jumpshot neither had, nor has, access to the same data without Avast's cooperation.

In light of the above, we are unwilling to settle this matter in accordance with your proposed terms. Jumpshot is willing to refund any pre-paid amounts for services not received; however, we must insist on full payment for all services which have been received, which, in the case of Market Beyond, amounts to $95,306.

Please do not hesitate to contact me by email at deren.baker@jumpshot.com if you wish to discuss this matter in further detail.

Sincerely,

DocuSigned by:

*Deren Baker*

0CDBD6F060164A7...

Deren Baker
Chief Executive Officer